**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KENNETH LAMAR GRIFFIN,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 26-CV-0717** |
| | : | |
| **LAURA WILLIAMS,** ***et al.*****,** | : | |
| **Defendants.** | : | |

**MEMORANDUM**

**HODGE, J.** **August 13, 2026**

Kenneth Lamar Griffin, who is currently incarcerated at SCI Dallas, brings this civil action pursuant to 42 U.S.C. § 1983 based on allegations that the Defendants—Delaware County and three prison officials—failed to protect him by housing him in conditions that facilitated his assault by another inmate when he was incarcerated at the George W. Hill Correctional Facility ("GWHCF"). The Defendants filed a Motion to Dismiss the Complaint, arguing that Griffin failed to exhaust administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). (ECF No. 15.) For the following reasons, the Court will deny the Motion and direct the Defendants to respond to Griffin's Complaint.

## I. FACTUAL ALLEGATIONS[1]

Griffin's claims arise from an incident that occurred on May 20, 2024, between 5:30 p.m. and 6:00 p.m., when another inmate attacked him with a knife. (ECF No. 2 ("Compl.") at 5, 12.) The inmate initially punched Griffin in the back and shoulder while he was in the day room on

[1] The following allegations are taken from the Complaint and documents attached to the Complaint. The Court adopts the sequential pagination supplied to the Complaint by the CM/ECF docketing system.

A-block on Unit 7. (*Id.* at 12.) Griffin managed to escape and tried to obtain a correctional officer's attention in the control panel. (*Id.*) He also banged on the entrance door to the unit to try and gain the attention of the correctional officer ("C/O") who was working on the block. (*Id.*) However, since the attack occurred while evening meals were being distributed "and there was only one C/O working the unit on the floor which gave that C/O the obligation of overseeing 4 blocks alone," the officer was "feeding the other blocks while [the] attack was transpiring." (*Id.*)

Griffin decided to lock himself into his cell until a correctional officer returned to A-block. (*Id.*) However, his attacker, with the help of another inmate, used "something sim[i]lar to a card that was thin enough to slide up and down seams of the door where it opens and locks" to "pop" the cell door open. (*Id.* at 13.) Griffin describes this as a "pop-out cell" and alleges that most of the cells at GWHCF are "pop-out" cells, meaning they have "broken cell doors—which makes it extremely easy for other inmates to force their way in." (*Id.*) Once Griffin's attacker was in the cell, he rushed Griffin and began stabbing him with a knife that was approximately six to seven inches long, striking Griffin in the forehead and face. (*Id.*) Griffin was ultimately able to gain control of his attacker and agreed to release his attacker if he would stop the assault. (*Id.*) The attacker and the other inmate left the cell and closed the door behind them. (*Id.* at 14.)

Griffin alleges that "[a]t this point the blood was coming down pretty bad" so he grabbed a towel and tried to clean his face in the sink. (*Id.*) His cellmate then "popped open" the door and asked if he was okay. (*Id.*) Griffin replied "no," and walked to the front of the block with the bloody towel on his face. (*Id.*) A correctional officer "noticed [him] instantly," motioned that he should "go in the octagon," and then "buzz[ed] [him] into the hall." (*Id.*) Sergeant Mayrussel arrived on the unit and asked Griffin what happened; he responded that he had been

stabbed. (*Id.*) Mayrussel then called for Griffin to be buzzed off the unit. (*Id.*) As he was walking to the medical center, Griffin was approached by a Lieutenant who asked him several questions, and he was then examined by medical staff and told he would be transported to the hospital. (*Id.*) Once at the hospital, Griffin was given a CAT scan and received stitches on his forehead and lip. (*Id.* at 14–15.) When he returned to GWHCF, he was initially placed on quarantine and then returned to general population. (*Id.* at 15.)

Griffin alleges that he spoke with counselor Mike Shank on March 7, 2024, prior to his attack, in connection with a "PREA Vulnerability Reassessment Questionnaire," (*id.*), a copy of which he attached to his Complaint as an exhibit, (*id.* at 18). As part of the questionnaire, he was asked, "since being in the facility have you ever been beaten up or threaten[ed] with being beaten up," to which he responded "yes" because he had been a witness in an attempted murder case from 2022, and had been "threatened by multiple inmates." (*Id.* at 15, 18.) The form also notes that Griffin "[a]sked about moving off of [indiscernible]" and identified an attorney for another person's homicide case. (*Id.* at 18.) In the same section of the form, there is a note to "call about alternate placement." (*Id.*)

Griffin also alleges that, prior to his attack, "there was way more than enough knowledge that shows a serious risk for 'any prisoner' within the confines" of GWHCF. (*Id.* at 16.) In that regard, he refers to a June 3, 2024 article about GWHCF, which reported that the county took over the facility in 2022, and that there had been seventy-nine inmate-on-inmate assaults in 2022, "the 'third most' in any jail" in Pennsylvania. (*Id.* at 15.) He further alleges that in January 2024, there was "a 5 on 1 attack where someone was strangled in the cell" at a time when no guards were present, leaving enough time for the attackers to "clean the victim[']s" blood. (*Id.* at 16.) According to Griffin, prison officials had "actual notice of the risk from expressly noted

concerns regarding the prison's safety" from past officials, as well as union and staff members. (*Id.*) He further asserts that there was a "pattern of similar incidents" at GWHCF, and that "[d]ue to the defendants['] indifference within the daily operations of the facility—lack of cameras, broken cell doors, and never enough officers to properly oversee the prison—there was no possible way to protect [Griffin] from the assault that [he] sustained." (*Id.*)

As a result of the attack, Griffin experienced nerve damage, facial scars, anxiety, fear of social interaction, and trauma. (*Id.* at 16–17.) He seeks damages. (*Id.* at 5.) In one portion of the form complaint that Griffin used to prepare his pleading, he indicated that he filed a grievance at GWHCF about "threatening/physical abuse & medical conditions" but that he got "no results." (*Id.* at 7.) He also indicated, in response to a question on the form as to whether he completed the grievance process, that he "[r]eceived no response from staff/or action." (*Id.*)

## II. DEFENDANTS' MOTION AND GRIFFIN'S RESPONSE

The Defendants move to dismiss Griffin's Complaint, arguing that he failed to exhaust administrative remedies in accordance with the relevant procedures at GWHCF. (ECF No. 15 ("Defs.' Mot.").) Their argument is based on their assertion that they "asked that the jail investigate its records" and that, although Griffin's "records appear complete on their face," no grievances have been located. (*Id.* at 5.) In his Response,[2] Griffin notes that he stated in his Complaint that he filed a grievance about "threatening/physical abuse" and generally argues that prison officials must comply with their own grievance processes. (ECF No. 22 ("Pl.'s Resp.") at 3–4.) He also attached a grievance to his response, in which he asks to be provided with "proper

[2] It appears that Griffin's response was docketed twice. (ECF Nos 22 & 23.) For purposes of this memorandum, the Court cites to the first docketed filing (ECF No. 22).

care" for injuries he sustained in the May 20, 2024 attack. (*Id.* at 7, 9.) Griffin acknowledges that this is a "medical grievance" and posits:

> [W]hen one advises the prisoner's grievance requirements: which is to submit only one issue per grievance form and then imposes further limitations on how many grievances a prisoner may have pending at a single time the question remains—what if one has valid concerns beyond the grievance limitations? Then again, the Defendants said that there were "no grievance records". . . maybe that's because if the courts look at where it says "grievance number" in the right corner there is none.

(*Id.* at 7.)

## III. STANDARD OF REVIEW

"A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citing *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 871 (3d Cir. 1992)). In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court applying this standard in a case filed by a litigant who is representing himself must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff, and "ask only whether [the] complaint, liberally construed contains facts sufficient to state a plausible . . . claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (citation modified), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (*pro se* filings are construed liberally). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Dismissal of a complaint based on an affirmative defense is only appropriate at the pleading stage when the "defense is apparent on the face of the complaint." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017). When considering dismissal based on an affirmative defense, a court "may not allocate . . . [burdens] . . . in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome [the] affirmative defense." *Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014) (internal citation omitted). Rather, the burden of pleading and proving an affirmative defense is borne by the defendant. *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997).

## IV. DISCUSSION

The PLRA "mandates that prisoners exhaust internal prison grievance procedures before filing suit." *Small v. Camden County*, 728 F.3d 265, 268 (3d Cir. 2013); *see* 42 U.S.C. § 1997e(a). Exhaustion is a non-jurisdictional "standard affirmative defense." *Perttu v. Richards*, 605 U.S. 460, 469 (2025). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006); *Prater v. Dep't of Corr.*, 76 F.4th 184, 203 (3d Cir. 2023) (explaining that courts "determine whether a prisoner has properly exhausted a claim by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances" (internal quotations omitted)). Claims that are not properly exhausted under the PLRA are procedurally defaulted. *See Woodford*, 548 U.S. at 92–93; *Spruill v. Gillis*, 372 F.3d 218, 230 (3d Cir. 2004). "[W]here a defendant moves to dismiss based on a failure-to-exhaust defense and the exhaustion issue turns on indisputably

authentic documents related to the inmate's grievances, [a court] may consider those documents without converting a motion to dismiss to a motion for summary judgment." *Rinaldi v. United States*, 904 F.3d 257, 261 n.1 (3d Cir. 2018); *Spruill*, 372 F.3d at 223.

Whether a grievance process is "available" depends on whether it is "capable of use for the accomplishment of a purpose," "accessible[,] or may be obtained." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (internal quotations omitted). An administrative procedure is unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when it is "so opaque that it becomes, practically speaking, incapable of use" such that "no ordinary prisoner can discern or navigate it"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44. Furthermore, "[w]henever a prison fails to abide by [its own] procedural rules, its administrative remedies have become unavailable, and inmates are deemed to have successfully exhausted their remedies for purposes of the PLRA." *Shifflett v. Korszniak*, 934 F.3d 356, 367 (3d Cir. 2019); *Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 154 (3d Cir. 2016) ("[W]e agree with Robinson that SCI Rockview rendered its administrative remedies unavailable to him when it failed to timely (by its own procedural rules) respond to his grievance and then repeatedly ignored his follow-up requests for a decision on his claim.").

It is not apparent from the face of the Complaint that Griffin failed to exhaust administrative remedies. As noted above, Griffin alleged in his Complaint that he filed a grievance at GWHCF about "threatening/physical abuse & medical conditions," but got "no results" and "[r]eceived no response from staff/or action." (Compl. at 7.) These allegations implicate availability of the grievance process because they raise questions about whether Griffin

attempted to exhaust administrative remedies, but was prevented from doing so by prison officials' failure to process his grievance in accordance with applicable procedures.[3] *See Webb v. Dep't of Just.*, 117 F.4th 560, 568 (3d Cir. 2024) (dismissal upon screening was improper because plaintiff's allegations that "his grievance 'was returned as unprocessed,' that he then 'went on the tablet and wrote' to prison officials, and that he received 'an illegal response'" raised "enough uncertainty about exhaustion to preclude dismissal"). Although the Defendants claim their records do not show a grievance, they do not address the allegations of the Complaint and instead essentially ask for dismissal based on their say-so. This is not sufficient to carry their burden. *See Showers v. Rodgers*, No. 23-1241, 2024 WL 1877028, at *4 (3d Cir. Apr. 30, 2024) (vacating dismissal for failure to exhaust: "In moving to dismiss the Grievance 4 claims for failure to exhaust, O'Brien relies on an email from an employee of the Commonwealth which states that Showers did not file a second-tier administrative appeal between November 2020 and May 18, 2021. To validly consider that statement, however, would require converting the motion to dismiss into a motion for summary judgment, as well as treating the hearsay as truthful." (citations omitted)). Accordingly, the Court will deny Defendants' Motion.

## V. CONCLUSION

For the foregoing reasons, and Griffin having raised sufficient allegations in his complaint, it is not apparent at this stage of the litigation that Griffin failed to exhaust administrative remedies. Thus, the Court denies the Motion to Dismiss and directs Defendants to answer the Complaint. An appropriate Order follows.

**BY THE COURT:**

---

[3] Griffin's Response also suggests that he may have been thwarted from filing a grievance due to representations about grievance limitations, which raises additional questions about availability of the grievance process.

**/s/ Hon. Kelley B. Hodge**

---

**KELLEY BRISBON HODGE, J.**